UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| ASOCIACIÓN DE SUSCRIPCIÓN CONJUNTA DEL SEGURO DE RESPONSABILIDAD OBLIGATORIO<br><br>Plaintiff,<br><br>v.<br><br>SECRETARY OF THE TREASURY OF THE COMMONWEALTH OF PUERTO RICO.<br><br>Defendant. | Civil No. 08-1707 (JAF) |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the ASOCIACIÓN DE SUSCRIPCIÓN CONJUNTA DEL SEGURO DE RESPONSABILIDAD OBLIGATORIO'S ("Plaintiff" or the "ASC") Verified Motion for Contempt against the Defendant SECRETARY OF THE TREASURY OF THE COMMONWEALTH OF PUERTO RICO (the "Secretary"). [Dkt. 121]. A hearing was held on December 20, 2012. The Court finds the Secretary in civil contempt.

**FACTUAL BACKGROUND**

On July 1, 2008, the ASC filed a complaint against the Defendant seeking declaratory and injunctive relief for violation of the Takings Clause of the Fifth Amendment to the United States Constitution. [Dkt. 1].

On July 9 and 10, 2008, the Court held a show-cause injunctive hearing, where the parties had the opportunity to submit all relevant evidence. On August 15, 2008, this

Court issued an Opinion and Order granting the injunctive relief requested by the Association. Accordingly, the Court

> enjoin[ed] Defendant, anyone acting pursuant to his orders, and his successors in any representative capacity, from depositing compulsory insurance premiums into the Commonwealth General Fund, other than collection fees. The Commonwealth must create a separate, interest-bearing fund in which to deposit all compulsory insurance premiums collected on Plaintiff's behalf, without prejudice to Defendant's statutory right to retain a collection fee.

[Dkt. 38]. The Court also ordered the parties to meet and devise the specific mechanism that, by stipulation, would be implemented to create the separate account in a private banking institution to achieve the remedy ordered. Opinion and Order, at 12.[1]

Pursuant to this Order, the parties met and agreed, among other things, the following:

    a. With regards to the premiums collected directly by the Treasury Department at the *"colecturías"*[2], the parties agreed that the Treasury Department would transfer certain funds to the Association's bank every week;[3]

---

[1] On May 8, 2009, Judgment was entered in favor of the Association and against the Defendant, incorporating the aforementioned terms. [Dkt. 102]. The Judgment became final and unappealable on June 7, 2011, when the Court of Appeals for the First Circuit granted the Defendant's voluntary dismissal of its appeal. [Dkt. 105].

[2] Internal Revenue Service Offices.

[3] The schedule upon which the funds were to be transferred was amended by the parties on September 4, 2009, [Dkt. 103].

         b.      With regards to the premiums collected by third parties, the parties agreed to establish regulation pursuant to which the Association would directly receive the premiums collected by the third parties.

See, Informative Motion Regarding Terms of Stipulated Implementation (Partial), Exhibit A, [Dkt. 98-1]. These terms were a concession by the ASC to the Treasury Department in order to accommodate the alleged impossibility of strictly complying with the terms of the injunction.

It appears that, after lengthy negotiations with ASC, the Treasury Department enacted Regulation no. 7831 of March 29, 2010 and Regulation No. 7969 of December 29, 2010. Both of these regulations were enacted in order to comply with the stipulated implementation terms and called for the direct payment to, or the direct debit by the Association of the compulsory insurance premiums collected by third parties.

On December 1, 2012, the ASC filed a Verified Motion for Contempt alleging that Defendant had disobeyed the injunction and had failed to abide by the stipulated terms for the implementation of the injunction. ASC further requested that, after a hearing, the Court hold the Secretary in contempt for disobeying the Court's injunction, and that any other appropriate relief as necessary be issued in order to enforce the Judgment. [Dkts. 123, 130].

On December 20, 2012, the Court held an evidentiary hearing to elucidate the matters raised in the Verified Motion for Contempt. The Court heard the testimonies of Jose Luis Blanco-Latorre (President and CEO of the ASC), Monica Rivera-Pico, and Tomas Céspedes-Rodriguez (Sub director of Technology at the Treasury Department);

Osvaldo Miranda (VP Finance and Planning of the ASC) testified as an expert on financial analyses. The Court also received documentary evidence on the matter.

The evidence introduced at the hearing conclusively established the following:

**<u>Regulation no. 7831 of March 29, 2010</u>**:

    a.    Regulation no. 7831, which came into effect on April 29, 2010, is applicable to official inspection stations (i.e., gas stations) authorized by the Treasury Department to collect the fees associated with the renewal of a vehicle's license) ("EOI"). Participating in the renewal of motor vehicle licenses is wholly voluntary.

    b.    Regulation no. 7831 calls for the Association to directly debit the compulsory insurance premiums from the EOIs bank accounts.

    c.    In order to accomplish this, Regulation no. 7831 requires the EOI to authorize such debit as a requirement for obtaining authorization from the Treasury Department for renewing vehicle license.

    d.    Each day, the Department of Transportation and Public Works ("DTOP") provides both the Treasury Department and the ASC with the electronic data required by the Regulation which identified all motor vehicles which paid the compulsory insurance premiums at EOIs during the previous day.

    e.    The ASC uses this information to debit the accounts of the EOIs which it has been authorized to debit.

Civil No. 08-1707 (JAF)                                                                                                       - 5 -

       f.     Although the Treasury Department has stated to the ASC that <u>all</u> EOIs must comply with Regulation no. 7831, it has only required those EOIs that are newly authorized after April 29, 2010 to comply with Regulation no. 7831, and to authorize the Association to debit their bank accounts.

       g.     To date, only 15 out of approximately 166 total EOIs currently authorized to renew vehicle licenses have authorized the ASC to directly debit their bank accounts. The ASC debits only these EOIs bank accounts daily.

       h.     The ASC has complained to the Treasury Department regarding this situation in informal communications, in e-mails, in meetings, and in formal communications from the ASC's President however, the Treasury Department has failed to correct this situation.

**Regulation No. 7969 of December 29, 2010**:

       a.     Regulation no. 7969, which came into effect on January 28, 2011, calls for all participating financial institutions to directly transfer the compulsory insurance premiums they collect to the Association. Participation by financial institutions in the renewal of motor vehicle licenses is wholly voluntary.

       b.     During the month of October 2011, the ASC was able to first obtain compliance with Regulation no. 7969 from Banco Popular de Puerto

        Rico, which accounts for approximately 50% of the compulsory insurance premiums collected by financial institutions.

  c.  During the months of October 2011 through February 2012, Banco Popular de Puerto Rico transferred daily to the ASC the compulsory insurance premiums collected in its branches the previous day, along with certain electronic data required by the Regulation which identified the motor vehicles for which the premiums were paid.

  d.  However, during the spring of 2012, the ASC became aware that the Treasury Department, unilaterally and without ASC's consent, ordered all financial institutions to stop transferring the compulsory insurance premiums to the ASC and to transfer the funds to the Treasury Department instead. All financial institutions which had been transferring to the ASC the compulsory insurance premiums stopped doing so effective March 1, 2012, except for Doral Bank.

  e.  Moreover, the Treasury Department, unilaterally, and in total disregard of its obligations under the injunction, announced that it would amend Regulation No. 7969 to eliminate the direct transfer to the Association of the compulsory insurance premiums collected by the financial institutions. A proposed regulation to that effect was published.

  f.  As a result of the aforementioned, currently, Doral Bank is the only financial institution that directly remits to the Association the

          compulsory insurance premiums it collects. This accounts for less than 0.01% of the compulsory insurance premiums that are collected by the financial institutions.

    g.    The ASC has complained to the Treasury Department multiple times—in informal communications, in email, in meetings, and in formal correspondence—regarding the lack of compliance with the Regulation. However, the Treasury Department has ignored the ASC's complaints.

**Lack of sufficient data to validate the transfer of funds**

As part of the stipulated implementation terms, the Treasury Department agreed to provide the ASC "with the disclosure requirements of 26 L.P.R.A. §8055(n) so that the ASC can ascertain the accuracy of the amounts transferred by the Treasury Department to the ASC in compliance with the previous schedule." See, Informative Motion Regarding Terms of Stipulated Implementation (Partial), Exhibit A, ¶1(c), [Dkt. 98-1].

The evidence at the hearing conclusively established that, although the Treasury Department provides the ASC with certain data every month purportedly representing the motor vehicles which have renewed their vehicle permits during said month, the data provided is inadequate and incomplete and does not appear to present a true picture of the funds collected by the Treasury Department on behalf of the ASC:

      **a.**    **Data provided by the Treasury Department for the vehicle permits issued or renewed at "*colecturías*":**

Osvaldo Miranda testified that, during the past 18 months, the data provided by the Treasury Department disclosed that it transferred to the ASC compulsory insurance premiums for less than 1,000 newly registered vehicles, which include new vehicles sold and imported vehicles registered. During that same time period, the automobile industry reported that approximately 150,000 new vehicles were sold in the Puerto Rico market. This is consistent with the approximately 35,000 requests for reimbursements received by the ASC from other insurers for new vehicles covered by traditional insurance. Accordingly, the numbers for newly registered vehicles reported by the Treasury Department—and, thus, the premiums transferred to the ASC for such item—are clearly incorrect. This discrepancy amounts to approximately $15,000,000 in underpayments to the ASC.

Mr. Miranda also testified that the data provided by the Treasury Department does not disclose that it transfers to the ASC any of the compulsory insurance premiums it charges for provisional permits. This notwithstanding, the ASC has received claims for compulsory insurance paid to the Treasury Department on such permits.

Furthermore, Mr. Miranda testified that it is not unusual for the ASC to process claims on compulsory insurance paid to the Treasury Department for which no information can be matched to the data transferred from such Department, although the claimant can provide documentary evidence of such payment.

b. **Data provided by the Treasury Department for the vehicle permits renewed at EOIs:**

The data provided by the Treasury Department for vehicle permits renewed at EOI originates with DTOP; it is supposed to be the same data which DTOP sends daily to the ASC. However, Mr. Miranda testified that, in the last 18 months, there have been 6 instances in which the number of vehicle permits that have been renewed at EOI informed by DTOP to the ASC in a certain month significantly different from those informed by the Treasury Department to ASC for that same month. He further stated that, in half of those instances, the difference exceeds 20%. The witnesses for the Treasury Department could not explain this difference.

c. **Data provided by the Treasury Department for the vehicle permits renewed at financial institutions:**

According to the testimony at the hearing, the Treasury Department receives data for 100% of the vehicle permits renewed

at financial institutions, except for those few permits renewed at Doral Bank.

Despite this assertion, Mr. Miranda testified that the ASC had obtained information for the vehicle permits renewed during a six-month period by Popular Auto for vehicles leased through that institution for which the compulsory insurance premium had been paid. An audit of the vehicle permits informed by Popular Auto revealed that the Treasury Department had failed to disclose any data to the ASC on the aforementioned permits.

Mr. Miranda also testified that the number of total number of motor vehicle permits renewed monthly at financial institutions, as informed to the ASC by the Treasury Department, is slightly larger than that informed by Banco Popular de Puerto Rico to the ASC during those months in which that financial institution was reporting its daily data directly to the ASC. Given the fact that Banco Popular de Puerto Rico accounts for approximately 50% of all motor vehicle permits renewed at financial institutions, the monthly number reported by the Treasury Department—which purportedly includes <u>all</u> financial institutions—is grossly insufficient.

d.  **Reliable Data from Other Sources:**

The premiums for the insurance underwritten by the government sponsored Automobile Accident Compensation

Administration (AACA) are collected using the same mechanism as the compulsory insurance premiums: they must both be paid annually, together with the vehicle license renewal fees. Therefore, with the few adjustments to which Mr. Miranda testified, it is possible to arrive at an approximate number of vehicles which should have paid for the compulsory insurance premium at the time of the renewal of their permit.

Mr. Miranda testified that, considering the AACA's Audited Financial Statements, it appears that the Treasury Department failed to transfer to the ASC over $20million since this Court issued its injunction.

e. **Previous Experiences with the Treasury Department:**

Mr. Miranda also testified that past experiences with the Treasury Department further supported the ASC's conclusion that the data provided by the Treasury Department did not accurately represent the compulsory insurance premiums supposed to be transferred to the ASC. For example, he testified that in February 2010—a year and a half after this Court issued its injunction—, the Treasury Department transferred to the ASC approximately $32.3million which the ASC, based on its actuarial studies and historical data, had claimed had been underpaid.

## LEGAL STANDARD FOR CONTEMPT

The disregard of judicial authority constitutes contempt of court. The United States district courts have the inherent authority and duty to protect and effectuate their judgments and to punish disobedience of or resistance to their lawful orders and decrees. Cooper v. Aaron, 358 U.S. 1 (1958).

The power of courts to punish for contempt is a necessary and integral part of the independence of the judiciary, and it is absolutely essential to the performance of the duties imposed on them by law. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 450 (1911).

Contempt of a federal court consists in 1) misbehavior by any person in the court's presence or so near thereto as to obstruct the administration of justice; or 2) misbehavior of any of its officers in their official transaction; or 3) disobedience or resistance to a court's lawful writ, process, order, rule, decree or command. 18 U.S.C. § 401. An act or omission in violation of an order of a court may subject a party either to criminal or civil contempt, or both. United States v. United Mine Workers, 330 U.S. 258 (1947).

Contempt proceedings can be either civil or criminal in nature. The characterization of a proceeding as civil or criminal depends primarily upon the purpose for which a contempt finding is sought and issued. Gompers v. Buck Stove & Range Co., 221 U.S. 418; Shillitani v. United States, 384 U.S. 364, 369 (1966). Civil contempt is remedial in nature and generally designed either to coerce compliance with a court order or to compensate the plaintiff for any losses sustained. See, United Mine Workers, 330 U.S. at 303–304.

"Recognizing the contempt power's virility and damage potential, courts have created a number of prudential principles designed to oversee its deployment." Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991). The evidence must establish (1) that the alleged contemnor had notice that he was "within the order's ambit," *id*. at 17; (2) that the order was "clear and unambiguous," e.g., AccuSoft Corp. v. Palo, 237 F.3d 31, 47 (1st Cir.2001) (quoting Project B.A.S.I.C., 947 F.2d at 16); (3) that the alleged contemnor had the ability to comply, see, United States v. Rylander, 460 U.S. 752, 757 (1983) (stating that "where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action"); and (4) that the order was indeed violated, Project B.A.S.I.C., 947 F.2d at 16. The First Circuit has sometimes combined the related "clear and unambiguous" and violation prongs, asking whether "the putative contemnor has violated an order that is clear and unambiguous." *Id*. When the question turns on findings of fact, "a complainant must prove civil contempt by clear and convincing evidence." *Id*. (internal quotation marks omitted) (quoting Langton v. Johnston, 928 F.2d 1206, 1220 (1st Cir.1991)).

After considering all the arguments and evidence, the Court determines that the ASC has shown by clear and convincing evidence that a finding of civil contempt against the Secretary is warranted. The Secretary had notice of the Court's Opinion and Order, he negotiated himself the terms for implementation of the injunction with the ASC and even participated in drafting of the regulations to purportedly comply with the stipulated implementation terms.

1      The Court's Opinion and Order and the implementation terms agreed upon by the
2  parties are "clear, definite, and unambiguous." Because the Secretary alleged that
3  segregating the compulsory insurance premiums from the Commonwealth's General
4  Fund, this Court allowed the parties to agree to a mutually acceptable means of
5  implementing the relief granted. It was the parties who agreed, in order for the Secretary
6  to be able to comply with the injunction, to have the Court implement its relief, partly,
7  through the direct transfer to the ASC of the compulsory insurance premiums collected
8  by third parties. The fact that the Treasury Department was to reduce the amount of
9  compulsory insurance premiums to be deposited in the General Fund is clear and
10 unambiguous. So is the importance of providing the ASC with an accurate accounting of
11 the compulsory insurance premiums that are, because of necessity, deposited into the
12 General Fund.
13     The Court also finds that the Secretary could have easily complied with the Court's
14 injunction. The evidence is clear that the Secretary was, in fact, complying with the terms
15 of the implantation or, at least, working towards that goal. The Secretary has not been
16 able to advance any logical reason for this about-face, nor why he refused to either
17 inform the ASC or attempt to work with the ASC to resolve any situation which may
18 have made compliance with the terms impossible. The Secretary has never appeared
19 before this Court to request a modification of the implementation terms.
20     In light of the aforementioned, the Court finds that there is clear and convincing
21 evidence on the record that the Secretary willingly failed to comply with the Court's
22 injunction, as well as the stipulated implementation terms agreed to by the parties and

subsequently approved by the Court. Thus, the Court finds that the Secretary to be in civil contempt.

Upon a finding of civil contempt, the Court has broad discretion in fashioning the appropriate coercive remedy. See, Goya Foods, Inc. v. Wallack Mgmt. Co., 344 F.3d 16, 21 (1st Cir. 2003). Civil contempt can be "imposed to compel compliance with a court order or to compensate a party harmed by non-compliance." United States v. Saccoccia, 433 F.3d 19, 27 (1st Cir. 2005); see also Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 827 (1994) (stating that the sanctions that may be imposed in a civil contempt proceeding are those "designed to compel future compliance with a court order, [which] are considered to be coercive and avoidable through obedience").

The Court must fashion sanctions that will ensure compliance with the Court's orders and at the same time correct some of the damage done by their violations. Therefore, the Court provides as follows:

1. On or before **February 28, 2013**, the Secretary shall provide a full and accurate accounting of the compulsory insurance premiums collected by the Treasury Department or by entities authorized by it to collect the compulsory insurance premiums on its behalf, from August 15, 2008 to date;

2. On or before **February 28, 2013**, the Secretary shall fully comply with stipulated implementation terms by assuring that all entities authorized by the Treasury Department to collect the compulsory insurance premiums on its behalf either directly transfer to the ASC or authorize the ASC to debit from their accounts the collected compulsory insurance premiums;

   3. On or before **February 28, 2013**, the Secretary shall correct the manner in which it informs the ASC of the compulsory insurance premiums collected by it, such that the ASC can ascertain the accuracy of the amounts transferred by the Treasury Department to the ASC.

   4. The Secretary will permit, cooperate and facilitate a complete audit of the moneys related to this case.  This audit may be carried out by independent auditors appointed by ASC.

   5. If the Secretary fails to comply with the aforementioned terms in the time period provided in this Order, he shall pay a monetary sanction in the amount of **FIVE THOUSAND DOLLARS ($5,000.00)** for each day in which non-compliance continues. The Court reserves the right to attach or garnish government funds without security bond, based on audited accounts by ASC appointed independent auditors.

   **6.** **Counsel for the Secretary shall immediately deliver a copy of this Memorandum Opinion and Order to the actual Secretary of the Treasury.**

## CONCLUSION

It is undeniable that the Treasury Department collects, manages, and holds the compulsory insurance premiums for the ASC in a fiduciary capacity. Four years ago, this Court admonished the Secretary about the unacceptable manner in which the Treasury Department was dealing with moneys that did not belong to the Commonwealth, in a clear breach of the fiduciary duties owed to the owners of those moneys.  Four years later, the Treasury Department is still playing fast-and-loose with money that belongs to someone else, in clear violation of this Court's orders.

1      In light of the recent change in the Commonwealth's Administration, this Court will grant the incoming Secretary until **February 28, 2013** to straighten this situation and fully comply with the stipulated implementation terms. The Secretary is advised that, after this date, the Court will not tolerate any excuses or validate this type of illegal governmental behavior.  It is illegal for anyone, including the Department of Treasury, to withhold third party funds, comingle them with general funds, use the moneys, or give the impression that such illegal conduct is taking place.  We will not allow this any further.

IT IS SO ORDERED

San Juan, Puerto Rico, this 9th day of January, 2013.

S/ José Antonio Fusté
JOSE ANTONIO FUSTE
U.S. District Judge