## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ASOCIACION DE SUSCRIPCION CONJUNTA DEL SEGURO DE RESPONSABILIDAD OBLIGATORIO**,

    Plaintiff,

    v.

**SECRETARY OF THE TREASURY OF THE COMMONWEALTH OF PUERTO RICO**,

    Defendant.

Civil No. 08-1707 (BJM)

### OPINION AND ORDER

    This case involves a long-running dispute between the Compulsory Liability Joint Underwriting Association (the "JUA")[1] and the Secretary of the Treasury (the "Secretary" or the "PRTD") over the collection of compulsory vehicle liability insurance ("CVLI") premiums. The JUA sought declaratory and injunctive relief in 2008, alleging that the Secretary, in his official capacity, was misappropriating CVLI premiums in violation of the Fifth Amendment's Takings Clause. Docket Nos. 1, 38. The JUA obtained injunctive relief in August 2008,[2] and judgment was entered in May 2009. Docket Nos. 38, 102. In January 2013, the Secretary was adjudged in civil contempt of the injunction order and the "stipulated implementation terms agreed to by the parties and subsequently approved by the Court." Docket No. 134 at 14–15. The JUA moved to attach the Commonwealth's funds and for monetary sanctions, Docket Nos. 140, 153, and the Secretary opposed. Docket Nos. 146, 156. The case is before me on consent of the parties. Docket No. 164.

    For the reasons set forth below, the JUA's motion is **GRANTED IN PART**.

---

[1] The Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio ("ASC"), a Commonwealth-created entity, is also known as the Compulsory Liability Joint Underwriting Association of Puerto Rico (the "JUA"). *See* P.R. Laws Ann. tit. 26, §§ 8051–61.

[2] In June 2011, the First Circuit Court of Appeals granted a voluntary request to dismiss an interlocutory appeal of the August 2008 injunction order. Docket Nos. 105, 106.

Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Secretary of the Treasury of the
Commonwealth of Puerto Rico, Civil No. 08-1707 (BJM)                                                                    2

## BACKGROUND

The JUA commenced a declaratory and injunctive relief action against the
Secretary[3] in July 2008. Docket No. 1. The JUA alleged in the complaint that the Secretary
was "committing ongoing Takings Clause violations by unlawfully appropriating" CVLI
premiums collected on behalf of the JUA. Docket No. 38 at 1. Shortly after the complaint
was filed, the court held a two-day evidentiary hearing. *Id.* at 2. On August 15, 2008, the
court enjoined the Secretary, "anyone acting pursuant to his orders, and his successors in
any representative capacity, from depositing [CVLI] premiums into the Commonwealth
General Fund, other than collection fees." *Id.* at 13. The court further ordered the
Commonwealth to "create a separate, interest-bearing fund in which to deposit all [CVLI]
premiums collected on" the JUA's behalf, "without prejudice to" the Secretary's "statutory
right to retain a collection fee." *Id.*

To implement the remedy above, the court ordered the parties to "each appoint one
high-level managerial staff member and one certified public accountant not employed by
either party," and tasked that group with devising a plan for "the specific account
mechanisms that by stipulation will be implemented to create the separate account in a
private banking institution." *Id.* at 12. The court cautioned that it would impose its own
plan to effectuate the remedy if "the parties and the team [were] unable or unwilling to
cooperate towards the implementation of the remedy." *Id.* And the parties were also warned
that "[a]ny deviation from the spirit and content of" the court's order would "be sanctioned
by civil contempt or otherwise." *Id.* Following the court-ordered meeting, the parties
agreed to the mechanism by which the court's order would be implemented, and their

---

[3] The JUA named Angel A. Ortiz Garcia ("Ortiz Garcia"), the Acting Secretary of the
Treasury, as the defendant in the original complaint. Docket No. 1. Juan C. Zaragoza-Gomez
("Zaragoza-Gomez") is currently the Secretary of the Treasury, and so, as "a matter of law," he has
been "automatically substituted as a party for [Ortiz Garcia] in his official capacity as Secretary."
*See Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores
Galarza*, 484 F.3d 1, 6 n.1 (1st Cir. 2007) (citing Fed. R. Civ. P. 25(d)(1)). For simplicity, I refer
to the defendant, who currently is Zaragoza-Gomez, as the "Secretary."

stipulations, which were amended, were presented to the court. Docket Nos. 98, 99, 103,

104.

Per the stipulations presented to the court, the parties agreed, among other things,

that the Secretary would provide the JUA "with the disclosure requirements of" P.R. Laws

Ann. tit. 26, 8055(n) "so that the [JUA] can ascertain the accuracy of the amounts

transferred by the Treasury Department to the [JUA] in compliance with the previous

schedule." Docket Nos. 98-1 ¶ 1(c), 103-2 ¶ 1(c), 134 at 7. In December 2012, the JUA

complained that the Secretary had disobeyed the injunction, asserted that the Secretary

failed to abide by the parties' stipulated terms for implementing the injunction, and moved

to have the court find the Secretary in civil contempt. Docket Nos. 123, 130. That same

month, the court held an evidentiary hearing and found the Secretary in contempt. Docket

No. 132.

In January 2013, the court issued the opinion and order finding the Secretary in

civil contempt of the injunction order and the "stipulated implementation terms agreed to

by the parties and subsequently approved by the Court." Docket No. 134 at 14–15. With

respect to the Secretary's efforts to meet its disclosure requirements, the court found that

the "evidence at the hearing conclusively established that, although the Treasury

Department provides the [JUA] with certain data every month purportedly representing the

motor vehicles which have renewed their vehicle permits during said month, the data

provided is inadequate and incomplete and does not appear to present a true picture of the

funds collected by the Treasury Department on behalf of the [JUA]." *Id.* at 7. In support of

this finding, the court noted the JUA's prior experiences with the Secretary and detailed the

data provided by the Secretary for vehicle permits issued or renewed at PRTD collection

offices knowns as *Colecturías*, official inspection stations, and financial institutions, as

well as "reliable data" from other sources. *Id.* at 7–11.

To bring the Secretary into compliance with the injunction and the stipulated

implementation terms, the Secretary was ordered, by a specified date, to: (1) "provide a

full and accurate accounting of the of the" CVLI "premiums collected by the Treasury
Department or by entities authorized by it to collect" those premiums "on its behalf, from
August 15, 2008 to date"; (2) "fully comply with the stipulated implementation terms by
assuring that all entities authorized by the Treasury Department to collect the" CVLI
"premiums on its behalf either directly transfer to the [JUA] or authorize the [JUA] to debit
from their accounts the collected" CVLI premiums; (3) "correct the manner in which [the
Secretary] informs the" JUA of the CVLI premiums collected by the PRTD, "such that the
[JUA] can ascertain the accuracy of the amounts transferred by the Treasury Department"
to the JUA; and (4) "permit, cooperate and facilitate a complete audit of the moneys related
to this case." *Id.* at 15–16. The court added that the "audit may be carried out by
independent auditors appointed by the" JUA, that a monetary sanction of $5,000 per day
would be imposed if the Secretary failed to comply with the court's orders, and that it
"reserved the right to attach or garnish government funds without security bond, based on
audited accounts" provided by JUA-appointed "independent auditors." *Id.* at 16.

In March 2013, the JUA informed the court about the parties' progress toward
implementing the court's orders. Docket No. 136. With specific reference to the court's
order that the Secretary "permit, cooperate and facilitate a complete audit of the moneys
related to this case," the JUA informed the court that the JUA had "appointed independent
auditors to carry out th[e] audit," that the parties were "working to put down in writing the
processes carried out by the Treasury Department in order to develop an audit[ing] plan,"
and that meetings were being conducted to ascertain the various processes by which the
CVLI premiums were collected and transferred. *Id.* at 12.

The court acknowledged the JUA's motion, and noted the "grim report on progress
and compliance with court orders." Docket No. 137. Afterward, the Secretary filed a
motion to inform the court about his compliance with the court's orders. Docket No. 138.
With respect to the Secretary's obligation to "permit, cooperate and facilitate a complete
audit of the moneys related to this case," the Secretary specifically referenced the JUA's

motion and stated that this part of the implementation plan was "still on an initial phase."

Docket No. 138 at 7. The court noted the Secretary's motion, and reiterated that the

Secretary was required to comply with the orders by the date specified by the court. Docket

No. 139. No further filings were received by the court until July 2016, when the JUA moved

to attach funds from the Commonwealth's General Fund and for monetary sanctions.

Docket No. 140. The parties have informed the court about their efforts to comply with the

court's orders during the time period between March 2013 and July 2016.

In June 2013, the Secretary and the JUA agreed to hire RSM Roc & Company

("RSM"), which offers the services of certified public accounts and consultants, "for the

purpose of assisting the parties in determining the amount of insurance premiums that

should have been transferred from PRTD to [JUA], as well as the amount of over or under

payment, if any, attributable to the period from August 15, 2008 to December 31, 2012."

Docket No. 140-1 at 1, 3. The team that would perform this work consisted of two certified

public accountants, a consulting partner, and other staff employed by RSM. *Id.* at 5.

The June 2013 letters, which were approved by the JUA and the Secretary, stated

that RSM's work would be "subject to attestation through agreed-upon procedures," and

that the attestation standards would be in accordance with those "established by the

American Institute of Certified Public Accountants." *Id.* at 2, 3. These letters also state that

RSM's work would follow the procedures agreed to by the PRTD, the JUA, and RSM. *Id.*

at 1, 3. And because "the procedures" that would be followed did "not constitute an audit

made in accordance with generally accepted auditing standards," RSM explained that it

would "not express an opinion on any of the specific elements, accounts, or items" in the

report it would prepare, or "on the financial statements of [JUA] or PRTD taken as a

whole." *Id.* at 2, 3.

In February 2016, RSM issued a report to assist "with the validation of certain

records and transactions of the" the PRTD "for the purpose of determining the amount of"

CVLI "premiums that should have been transferred from" the PRTD to the JUA from

Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Secretary of the Treasury of the
Commonwealth of Puerto Rico, Civil No. 08-1707 (BJM)                                                                 6

"August 15, 2008 to December 31, 2012." Docket No. 140-2 at 3. RSM's report states that

the "agreed-upon procedures engagement was conducted in accordance with the attestation

standards established by the American Institute of Certified Public Accountants." *Id.* It also

states that RSM was "not engaged to and did not conduct an audit, the objective of which

would be the expression of an opinion on the amount of" CVLI "premiums that should

have been transferred from" the PRTD to the JUA "and the resulting under payment." *Id.*

Before the report was issued, RSM gave the Secretary's counsel an opportunity to review

the contents of the report, and the Secretary's counsel stated that she "[r]eviewed and

agreed" with the report. Docket No. 160-1 at 1.

RSM's report details amounts the PRTD should have transferred to the JUA, and

makes recommendations to "allow for the proper validation of CVLI premiums in the

future." Docket No. 140-2 at 12. Relying on the findings in RSM's report, the JUA contends

that there is a "known amount" of underpayment totaling $1,912,046.57,[4] as well as a "risk

of underpayment" totaling $43,791,736.32. Docket No. 140 at 3 ¶¶ 9, 10. The JUA seeks

attachment of these funds, in addition to interest, and contends that the latter amount should

be disbursed to the JUA unless the Secretary "can conclusively establish—in the term[s]

determined by the court—that the possible underpayment detected by" RSM "did not, in

fact, occur." *Id.* at 9. The JUA also requests that the court impose a daily monetary sanction

of $5,000 "until the [Secretary] implements the modifications to the procedures for

collecting and handling the" CVLI premiums, which the JUA argues "are necessary to

assure the premiums collected are properly transferred to the" JUA. *Id.*

## DISCUSSION

The Secretary contends that the Eleventh Amendment bars the relief requested by

the JUA, that a state procedure exists to resolve any discrepancies in the CVLI premiums

transferred from the PRTD to the JUA, that the work RSM performed cannot be

---

[4] The Secretary acknowledged that he did not transfer part of this amount. *See infra* Pt. IV.

Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Secretary of the Treasury of the Commonwealth of Puerto Rico, Civil No. 08-1707 (BJM)                                                                                7

characterized as the "audit" ordered by the court, and that the JUA is not entitled to the full amount of funds requested.[5] Docket Nos. 146, 156.

## I.     Eleventh Amendment

The Secretary contends that the JUA may not be awarded the relief it has requested, arguing that the Eleventh Amendment prohibits a court order attaching state funds. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[6] U.S. Const. amend. XI. This constitutional amendment "stands as a palladium of sovereign immunity," and "bars federal court lawsuits by private parties insofar as they attempt to impose liabilities necessarily payable from public coffers, unless the state has consented to suit or unless the protective cloak of the amendment has been doffed by waiver or stripped away by congressional fiat." *Ramirez*, 715 F.2d at 697. "An administrative arm of the state is treated as the state itself for the purposes of the Eleventh Amendment, and it thus shares the same immunity." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 477 (1st Cir. 2009).

But the shield afforded by the Eleventh Amendment is subject to a well-recognized "exception"—the *Ex Parte Young* doctrine "allows a way around the bar to federal jurisdiction . . . in cases where *prospective* declaratory or injunctive relief is sought under federal law." *Flores Galarza*, 484 F.3d at 24 (emphasis added) (citing *Mills v. Maine*, 118 F.3d 37, 54 (1st Cir. 1997)); *see also Ex Parte Young*, 209 U.S. 123 (1908); *Ramirez*, 715

---

[5] "Congress has passed [the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA")], which attempts to address Puerto Rico's fiscal crisis by establishing the Financial Oversight and Management Board ("the Board") and a process for Puerto Rico to restructure its debt." *Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 123 (1st Cir. 2016). The JUA contends PROMESA does not bar the relief it has requested, and the Secretary has not argued to the contrary at this juncture—saying that "any discussion pursuant to PROMESA is not ripe." Docket Nos. 140 at 7–9, 146 at 9 ¶ 19.

[6] "Puerto Rico, despite the lack of formal statehood, enjoys the shelter of the Eleventh Amendment in all respects." *Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 697 (1st Cir. 1983).

Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Secretary of the Treasury of the
Commonwealth of Puerto Rico, Civil No. 08-1707 (BJM)                                                                    8

F.2d at 697 ("The distinction between permissible and impermissible relief . . . turns on which way Lot's wife is facing: prospective redress is allowable, retrospective redress is not."). In *Flores-Galarza*, for example, the First Circuit held that the Eleventh Amendment did not bar the JUA from seeking "a declaration that the taking of insurance premiums by" the Secretary "in his official capacity violate[d] the Constitution and an injunction enjoining" the Secretary from engaging in certain conduct in the future. *See Flores Galarza*, 484 F.3d at 24; *see also Ramirez*, 715 F.2d at 697 (federal court may "enjoin state officials to conform future conduct to the requirements of federal law, even though such a decree often has an effect on the public fisc.").

And while a federal court "cannot ordinarily order money payments by a state to make up for past violations" of federal law, the same is not true when the state disobeys a "forward-looking *court order* to make . . . payments." *See Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 625 F.3d 15, 19 (1st Cir. 2010) ("only if the state were disobeying a forward-looking *court order* to make . . . payments could a violation of that order be redressed by a federal court remedial directive to make payments to comply with the preexisting order") (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)). Likewise, "[a]ny claims for past non-compliance with the district court's preliminary injunction, though claims for monies due, are also not barred by the Eleventh Amendment." *Concilio de Salud Integral de Loiza, Inc. v. Perez–Perdomo*, 551 F.3d 10, 18 n.8 (1st Cir. 2008).

*Rio Grande Community Health Center, Inc. v. Armendariz*, 792 F.3d 229, 230 (1st Cir. 2015), aptly illustrates that the Eleventh Amendment does not bar a federal court from ordering the state to make payments in order to come into compliance with an existing, forward-looking injunction. In that case, "the district court entered an order compelling the payment of amounts due plaintiffs according to a lawful, prospective injunction." *Id.* "When the defendant failed to make those payments in accord with the terms of the order, and after exhausting efforts to secure defendant's voluntary compliance, the district court entered additional orders, one directed to the Commonwealth-owned Government

Development Bank of the Commonwealth of Puerto Rico (attaching funds held on behalf of the Commonwealth's Treasury Department), and a second directed to the president of that bank (ordering her to issue a check for the amount due plaintiffs)." *Id.* at 230–31.

The defendant appealed the district court's orders and sought a stay of those orders, arguing that the Eleventh Amendment barred the attachment of the Commonwealth's funds. *Id.* at 230–31. While the First Circuit initially granted the stay, the court ultimately removed that stay after rejecting the defendant's Eleventh Amendment argument. Expressing a "preliminary view" before resolving the merits of the entire appeal, the *Armendariz* court explained that "the principles of federalism that inform Eleventh Amendment doctrine surely do not require federal courts to enforce their decrees only by sending high state officials to jail. The less intrusive power to impose a fine is properly treated as ancillary to the federal court's power to impose injunctive relief." *Armendariz*, 792 F.3d at 231 (quoting *Hutto v. Finney*, 437 U.S. 678, 691 (1978)). The *Armendariz* court reasoned that the "orders on appeal would seem to represent actions more modest and less intrusive in their effect than the fines and imprisonment expressly blessed in *Hutto*." 792 F.3d at 231.

In this case, the court issued a forward-looking injunction order on August 15, 2008, and the interlocutory appeal of the injunction order was dismissed. The JUA now complains that it is entitled to the attachment of the Commonwealth's funds because the Secretary has failed to abide by the injunction (and the ancillary court order issued to implement that injunction) during the time period between August 15, 2008 and December 31, 2012. Because it is undisputed that all monies sought by the JUA accrued *only after* an injunction order had already been issued against the Secretary, the Eleventh Amendment does not prohibit the court from attaching state funds in order to bring the Secretary into compliance with the preexisting injunction and any ancillary court orders seeking to effectuate that injunction. *See, e.g.*, *Perez–Perdomo*, 551 F.3d at 18 n.8 ("Any claims for past non-

compliance with the district court's preliminary injunction, though claims for monies due,

are . . . not barred by the Eleventh Amendment.").

Nor does the Eleventh Amendment bar the court from imposing monetary sanctions

on the Secretary, who has previously been adjudged in civil contempt, in order to nudge

him into compliance with the court's preexisting orders. *See Hutto*, 437 U.S. at 691 ("The

less intrusive power to impose a fine is properly treated as ancillary to the federal court's

power to impose injunctive relief."); *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692

F.2d 790, 797–98 (1st Cir. 1982) ("The court's power to order . . . contempt fines, like its

power to order prospective payments generally . . . is ancillary to its power to order

compliance with the law," and that "power does not evaporate when the cost of compliance

is high") (internal citation omitted). Thus, the Eleventh Amendment does not shield the

Secretary from the relief requested by the JUA.

## II.    Alternative Procedure

The Secretary also contends that a procedure exists under Puerto Rico state law to

resolve any discrepancy in the amount of CVLI premiums received by the JUA. Puerto

Rico Law 253 ("Law 253") provides as follows:

> The Joint Underwriting Association shall conduct, at least once a year, a
> validation or corroboration process of the premiums received from the
> compulsory liability insurance collected by the Department of the Treasury
> and other entities authorized to collect the same. The Department of the
> Treasury, the Department of Transportation and Public Works, and other
> authorized entities shall be required to furnish the documents and
> information necessary for the Joint Underwriting Association to conduct
> said process. If there is a discrepancy between the amounts collected by the
> Department of the Treasury or by any other authorized entity and the
> amounts submitted to the Joint Underwriting Association, it shall be
> submitted to the consideration of an independent arbitrator selected by the
> concerned parties.

P.R. Laws Ann. tit. 26, § 8055(c)(4). Relying on this statutory provision, the Secretary

argues that the dispute currently before the court should be decided by an arbitrator.

But the difficulty with entertaining the Secretary's argument—at this particular juncture—is that a binding injunction and ancillary order are in place, and those orders have not been dissolved or modified by the court. Federal Rule of Civil Procedure 60(b)(5) permits the court to "modify [an] injunction," upon the defendant's showing "that 'it is no longer equitable that the judgment should have prospective application,' and that there has been the kind of 'significant change' in circumstances that the Rule requires." *See Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 38 (1st Cir. 2006); *Perez-Perdomo*, 551 F.3d at 16; Fed. R. Civ. P. 60(b)(5). And, so long as the district court "adheres to certain standards," the court also has the discretion to dissolve an injunction. *See Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 242 (3d Cir. 2003); *Glasco v. Hills*, 558 F.2d 179, 180 (3d Cir. 1977) ("the law has entrusted the power to grant or dissolve an injunction to the discretion of the trial court in the first instance").

*Alley v. U.S. Department of Health & Human Services*, 590 F.3d 1195, 1209–10 (11th Cir. 2009), suitably illustrates why the Secretary's argument is procedurally unsound in the context of the matter presently before the court. In that case, a valid injunction was in place and the defendant argued on appeal that the "rationale" for the injunction was "obsolete" on account of congressional enactments that allegedly made significant changes to the Medicare reimbursement scheme. The Eleventh Circuit rejected the "collateral attack" on the long-ago-issued injunction, reasoning that such issues would have to be litigated in "a proceeding to alter or vacate the injunction." *Id.*; *see also Rodriguez v. Swank*, 496 F.2d 1110, 1113 (7th Cir. 1974) ("amendment of the regulations" was irrelevant in appeal of "proceeding to enforce federal injunction" because that issue was a "matter to be taken up with the district court on a motion to modify the injunction").

As in *Alley*, to the extent the Secretary believes that a procedure under state law makes the injunction order obsolete, improper, or no longer equitable, the Secretary must raise that issue in a proceeding to modify or dissolve the injunction and ancillary court order that currently bind the parties. *See Alley*, 590 F.3d at 1210. Such a motion has not

been filed at this particular juncture, and I express no view whatsoever on the propriety of
filing—or merits of—such a motion. Thus, because no motion to modify or dissolve the
injunction has been granted at this point in time, the parties remain bound by the injunction,
the January 2013 ancillary court order, and any other ancillary orders the court issues to
enforce compliance with August 2008 injunction.

## III.      Ancillary Court Order

The Secretary argues that the JUA is not entitled to relief at this juncture because
he has not disobeyed the ancillary court order issued in January 2013. The January 2013
court order—which was issued to bring the Secretary into compliance with the August
2008 injunction—required the Secretary to "permit, cooperate and facilitate a complete
audit of the moneys related to this case." The order also stated that the "audit" could be
"carried out by independent auditors appointed by the" JUA, and that the court reserved
the right to attach government funds "based on audited accounts by ASC appointed
auditors." The Secretary suggests no audit ever occurred.

Federal Rule of Civil Procedure 65(d) "provides that every injunction must 'state
the reasons why it issued.'" *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Municipality of
San Juan*, 773 F.3d 1, 9 (1st Cir. 2014); Fed. R. Civ. P. 65(d)(1)(A). The Rule also requires
"that every injunction state in specific terms and reasonable detail the conduct that it
restrains or requires." *Alley*, 590 F.3d at 1205; Fed. R. Civ. P. 65(d)(1)(B), (C). "This
requirement of specificity and reasonable detail, based in part on notions of basic fairness,
ensures that individuals against whom an injunction is directed receive explicit notice of
the precise conduct that is outlawed" or required. *See Alabama Nursing Home Ass'n v.
Harris*, 617 F.2d 385, 387–88 (5th Cir. 1980).

And where, as here, "a defendant has failed to comply with a prior injunction,"
ancillary injunctive relief "is common." *Aristud-Gonzalez v. Gov't Dev. Bank for P.R.*, 501
F.3d 24, 27 (1st Cir. 2007) (citing *Nat'l Law Ctr. on Homelessness & Poverty v. U.S.
Veterans Admin.*, 765 F. Supp. 1, 6 (D.D.C. 1991) ("A court has the authority to issue

further orders to enforce its prior injunction")). When issuing such ancillary orders, "a court may take into account the compliance with the court's previous orders and the need for a further order to prevent 'inadequate compliance' in the future." *Nat'l Law Ctr. on Homelessness & Poverty*, 765 F. Supp. at 6. "As with the initial injunction, however, an order granting further injunctive relief must also be 'narrowly tailored to remedy the specific harm shown.'" *Id.* (citing *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)).

The Secretary suggests that the January 2013 court order did not reasonably convey what was required of the parties, and contends that the term "audit" must be ascribed a very narrow, technical construction. When the "text of an injunction is 'subject to reasonable interpretation,'" the court must give "fair meaning" to its text. *Alley*, 590 F.3d at 1207; *see also Youakim v. McDonald*, 71 F.3d 1274, 1283 (7th Cir. 1995) ("[T]he terms of an injunction, like any other disputed writing, must be construed in their proper context."). The injunction may not, however, "be expanded beyond the meaning of its terms absent notice and an opportunity to be heard." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002) (citations omitted).

In the Secretary's view, the term "audit" must be defined in accordance with "accounting terms." Docket No. 153 at 2 ¶ 4. The Secretary has not come forward with a proposed definition for the term "audit," but relies on the portion of RSM's report which states that RSM "was not engaged to and did not conduct an audit, the objective of which would be the expression of an opinion on the amount of" CVLI premiums that should have been transferred from the PRTD to the JUA. The June 2013 letters that were issued when RSM was hired explained the reason why the company did not express an opinion: "the procedures" that were followed did "not constitute an audit made in accordance with generally accepted auditing standards." In this vein, RSM's report added that, with "additional procedures," "other matters might have come to" its attention that would have

been reported to the parties. Relying on the foregoing, the Secretary argues that the work

RSM performed cannot be characterized as an "audit."

The JUA, on the other hand, contends that a less technical definition of the term

"audit" was intended by the court's order. In support of this position, the JUA highlights

that the term "audit" may be defined as "a complete and careful examination of financial

records of a business or person"; "a careful check or review of something." Docket No.

153 at 2 (citing Merriam-Webster Online Dictionary, *available at* https://www.merriam-

webster.com/dictionary/audit); *see also* Black's Law Dictionary 150 (9th ed. 2009) (*audit*

defined as "[a] formal examination of an individual's or organization's accounting records,

financial situation, or compliance with some other set of standards"); The American

Heritage Dictionary 141 (2d ed. 1982) (*audit* defined as "[a]n examination of records or

accounts to check their accuracy"; *audited* defined as "[t]o examine, verify, or correct

(accounts, for example)"); Webster's II New Riverside Dictionary 137 (1984) (similar

definitions provided). The JUA posits that the less technical definition of the term "audit"

adequately encompasses the work performed by RSM.

The plain meaning of the text in the order supports the JUA's construction of the

term "audit" more so than the one urged by the Secretary. The problem with the Secretary's

construction of the order is "that the narrowest conceivable interpretation of an injunction

is not necessarily the correct one." [7] *See Alley*, 590 F.3d at 1205. And this is because

"[c]ompliance with an injunction cannot be avoided by an overly literal or hypertechnical

reading of the injunction." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1548 (11th Cir. 1986)

(citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949)). As the Seventh Circuit

---

[7] While "[g]reat deference is due the interpretation placed on the terms of an injunctive
order by the court who issued and must enforce it," *Harris*, 617 F.2d at 388, I did not issue either
the August 2008 injunction or the January 2013 ancillary court order. For this reason, I do not have
"any insider knowledge" into the intent behind the orders, and must evaluate the meaning of the
ancillary order by considering the plain meaning of its text and the context in which it was issued.
*See Alley*, 590 F.3d at 1202 ("any insider knowledge that a judge may have about her own orders
would not extend to the orders of another judge").

has explained, "the rule of strict construction of injunctions should not be pressed to a dryly logical extreme. If narrow literalism is the rule of interpretation, injunctions will spring loopholes . . . and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug the loopholes." *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995) (internal citations omitted). The Supreme Court expressed a similar sentiment in *McComb*. *See McComb*, 336 U.S. at 192–93.

It is true that the term "audit" may be construed in a very technical manner: "The objective of an audit is to express an *opinion* on the *fairness*, in all material respects, with which a company's financial statements present the financial position, results of operations, and cash flows of the company in conformity with" the Generally Accepted Accounting Principles ("GAAP"). *See In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 479–80 (S.D.N.Y. 2005) (emphases added). And when conducting an audit, "an auditor must follow the standards that constitute" Generally Accepted Auditing Standards ("GAAS")— standards authored by The American Institute of Certified Public Accountants. *See id.*

But such an overly technical reading of the January 2013 ancillary order is not evident from its language because the order makes no mention of the GAAP or GAAS standards. Nor did the ancillary court order state that the "opinion" of the auditors would be necessary for the court to determine the amount of CVLI premiums that should have been transferred from the PRTD to the JUA. Rather, the court stated that it reserved the right make further orders based on "audited accounts" by "independent auditors." Because PRTD's financial records were examined by accountants not employed by that government agency, the audit surely was at the very least an *independent* examination of the PRTD's records. *See* Black's Law Dictionary, *supra*, 150 (*independent audit* defined as "[a]n audit conducted by an outside person or firm not connected with the person or organization being audited"). Thus, the plain meaning of term "audit" encompasses the work performed by RSM in this case—even if that work could not be considered an "audit" under the standards used by The American Institute of Certified Public Accountants.

What is more, the context in which the January 2013 ancillary order was issued also undercuts the Secretary's overly narrow construction. After examining the plain meaning of the language used in the order, the "language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *United States v. Christie Indus., Inc.,* 465 F.2d 1002, 1007 (3d Cir. 1972); *see also Haskell v. Kan. Natural Gas Co.*, 224 U.S. 217, 223 (1912) ("[T]he decree must be read in view of the issues made and the relief sought and granted."); *Alley*, 590 F.3d at 1208 (court considered context in which order was issued, and found that "much of that context [was] provided in the opinion issued in tandem with the injunction").

The court's January 2013 opinion and order sheds light on the impetus for the relief granted. Docket No. 134. At that time, the court found the "evidence at the hearing conclusively established that, although the Treasury Department provides the [JUA] with certain data every month purportedly representing the motor vehicles which have renewed their vehicle permits during said month, the data provided is inadequate and incomplete and does not appear to present a true picture of the funds collected by the Treasury Department on behalf of the [JUA]." Based on this deficiency, the court sought to ameliorate the lack of accuracy, transparency, and accountability by ordering the Secretary to "correct the manner in which" the PRTD informed the JUA of the CVLI premiums, "such that the [JUA] can ascertain the accuracy of the amounts transferred by" the PRTD to the JUA. Toward this end, the court also required the Secretary to "permit, cooperate, and facilitate a complete audit of the moneys related to this case."

After the ancillary order was issued, the Secretary and the JUA filed informative motions in March 2013. The JUA informed the court that the JUA had "appointed independent auditors to carry out th[e] audit," that the parties were "working to put down in writing the processes carried out by the Treasury Department in order to develop an audit[ing] plan," and that meetings were being conducted to ascertain the processes by

which the CVLI premiums were collected and transferred. The Secretary acknowledged
the JUA's motion in the informative motion he filed with the court, and the court took note
of both informative motions. The Secretary did not seek a "clarification or construction of
the order," *see McComb*, 336 U.S. at 192 (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9
(1945)), and so it appeared that the parties were cooperating to implement the court order.

Indeed, the Secretary, RSM, and the JUA devoted over two years to ascertain the
funds that should have been transferred from the PRTD to the JUA. At no point during this
time period did the Secretary seek a clarification or construction of the order. Nor did the
Secretary complain to the court that the agreed-upon procedures were inadequate to comply
with the court's order. Instead, after the Secretary represented to the court that the parties
were already on the "initial stages" of implementing a plan to effectuate the court's orders,
the Secretary implemented a joint plan with RSM and the JUA that he now claims does not
comply with the court's order. Unfortunately, this is not the first time the Secretary has
attempted to "negotiate[] for himself the terms for implementation of the injunction."
Docket No. 134 at 13. Thus, because the Secretary effectively took it upon himself to
construe a term in the court's order in an overly narrow and hypertechnical manner, the
Secretary's argument is unconvincing—particularly because the Secretary never sought a
clarification or construction of the order. *See McComb*, 336 U.S. at 192 (where the
contemnors did not seek a clarification or construction of the order, they effectively
"undertook to make their own determination of what the decree meant" and "acted at their
peril" when they did so).

In sum, having considered the plain meaning of the language in the court's January
2013 ancillary order, the context in which that order was issued, the parties' representations
to the court after the order was issued, and the Secretary's prior history of non-compliance
with the court's orders, I find the Secretary's argument unpersuasive. Thus, the report
prepared by RSM will be considered to determine the amount of CVLI premiums that
should have been transferred from the PRTD to the JUA.

## IV.   Amounts Owed

Relying on RSM's report, the JUA initially sought attachment of a "known underpayment" totaling $1,912,046.57. Docket Nos. 140 at 9, 140-2 at 11 ¶ IV(1). The parties divided this total amount into three parts: (1) $337,245.25; (2) $1,138,687; and (3) $436,114.32. The Secretary acknowledged that he did not transfer the $337,245.25 to the JUA, Docket No. 146 at 7, and the JUA subsequently lowered this portion of the request for attachment of funds to $1,574,801.32. Docket No. 153 at 11 ¶ (a).

The amount of $1,138,687 corresponds to CVLI premiums that Susan Gas Station (the "Gas Station"), one of the official inspection stations, allegedly did not transfer to the PRTD or the JUA. The Secretary has informed the court that the PRTD filed an action against the Gas Station in Puerto Rico state court for the collection of the CVLI premiums. Docket No. 146 at 6. It is unclear at this juncture whether that litigation has resulted in any payments to the PRTD. While the JUA acknowledges that the PRTD has not collected these particular CVLI premiums, it nonetheless asserts that the Secretary should pay these funds because the court had already ordered the Secretary to have the official inspection stations directly transfer the CVLI premiums to the JUA. Docket No. 153 at 6 & 6 n.2.

An order attaching the $1,138,687 is premature and unwarranted at this point in time. Because it is undisputed that the PRTD has not collected the CVLI premiums from the Gas Station, the PRTD has not—as a factual matter—misappropriated these particular CVLI premiums in violation of the Fifth Amendment's Takings Clause. The August 2008 injunction was issued to enjoin takings of the CVLI premiums, and this is not the type of conduct that has occurred with the CVLI premiums from the Gas Station. *See Cok v. Family Court*, 985 F.2d 32, 36 (1st Cir. 1993) (injunction order invalid where it was not limited to "restricting improper conduct of the type which the . . . record indicates [the party sought to be enjoined] has displayed in the past."). The court may be in a position to make an order with respect to the $1,138,687 if and when the Secretary has collected the disputed CVLI premiums from the Gas Station. Thus, the Secretary shall inform the court and the JUA:

(1) when the litigation in the Puerto Rico state court has concluded, and (2) whether the PRTD has collected any payments from the Gas Station. The JUA shall inform the court if it finds evidence that the PRTD received the disputed CVLI premiums from the Gas Station.

The amount of $436,114.32 corresponds to a "shortage" found when the PRTD made a special payment to the JUA. According to RSM's report, the PRTD "self-detected" an omission in CVLI premiums corresponding to the time period between November 2008 and May 2009. Docket No. 140-2 at 8. To correct the omission, the PRTD made a special payment of $32,293,414.60 to the JUA. *Id.* However, RSM found that the total gross omission was higher than the amount detected by the PRTD. Per the findings in RSM's report, the omission totaled $34,452,135.70 without the 5% fee collected by the PRTD, and $32,729,528.92 after factoring in that fee. RSM arrived at the $436,114.32 figure by finding the difference between $32,729,528.92 (the total omission, minus the 5% fee) and $32,293,414.60 (the special payment the PRTD made to the JUA).

The Secretary now argues that the $436,114.32 figure is inaccurate because the special payment did not include the month of May 2009. Docket No. 146 at 6. The Secretary states that this circumstance was disclosed in the "[d]ocumentation [that] was provided to [the JUA's] appointed independent auditors for their examination"—a "Comprobante de Jornal"—and that "it appears [that RSM] did not take notice of" this circumstance. *Id.* The Secretary proffered no evidentiary support for this assertion. *See id.* The JUA, on the other hand, states that the month of May 2009 *was* included in the documentation the Secretary allowed RSM to examine, and that RSM's finding is sound. Docket No. 153 at 6.

A review of RSM's report reveals that RSM included the month of May 2009 in its calculations, and that RSM "examined the supporting documentation"; this documentation allowed RSM to find that the "actual payment made by [the PRTD] to the [JUA] was short by $436,114.32." Docket No. 140-2 at 8 & 8 n.10. RSM's report further specifies that the

auditing team "examined the 'Comprobante de Jornal' through visual examination since
[they] were not allowed to retain a copy for [their] records." *Id.* at 8 n.10. Based on the
findings in RSM's report and the inadequacy of the Secretary's response to this finding, I
find that the attachment of $436,114.32, plus interest, is warranted, and that these funds
should be disbursed to the JUA.

The JUA also seeks to attach $43,791,736.32 because RSM found that there was a
"risk of underpayment" from August 2008 to December 2012. Docket No. 140-2 at 11. The
JUA asserts that this amount should be disbursed unless the Secretary "can conclusively
establish—in the term[s] determined by the court—that the possible underpayment
detected by" RSM "did not, in fact, occur." An order attaching these funds is unwarranted
and premature at this juncture because—as plaintiff readily acknowledges—"the [JUA] is
not claiming that the auditors made a finding that the [PRTD] owed the [JUA] the exact
amount of $43,791,736.32." Docket No. 153 at 7. And the JUA also acknowledges that
"the auditors were unable to make a finding as to the total amount of the underpayment, *if
any*, to the [JUA], precisely because the [Secretary] lacked sufficient internal controls." *Id.*
(emphasis added). While more robust internal controls may be in order for the JUA to
ascertain any additional amount of underpayment, if any, an order attaching the
$43,791,736.32 figure from the Commonwealth's funds is unwarranted absent a concrete
finding by independent auditors that the underpayment in fact occurred.

Yet, given RSM's finding that there is a large "risk of underpayment," the parties
are ordered to continue working together to ensure that the PRTD has not underpaid the
JUA. To this end, the Secretary shall appoint independent auditors to establish that the
underpayment did not occur. The JUA shall also appoint an independent auditor, which
may continue to be RSM, to determine whether the underpayment in fact occurred. In
essence, the court is ordering an independent "double audit" where one of the auditors will
be appointed by the Secretary and the other by the JUA. *See* Black's Law Dictionary, *supra*,

Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio v. Secretary of the Treasury of the
Commonwealth of Puerto Rico, Civil No. 08-1707 (BJM)                                                    21

150 (*double audit* defined as "[a]n audit of the same subject performed separately by two

independent auditors").

The parties are further ordered to meet for the purposes of establishing the

procedures that will govern each audit. If the parties can agree to the procedures that will

govern each audit, the audits will be conducted in accordance with those procedures. If the

parties cannot agree, they shall inform the court and the court will procced accordingly.

After the independent double audit—which should be limited to ascertaining whether the

PRTD failed to transfer $43,791,736.32 in CVLI premiums to the JUA—has taken place,

a hearing may be necessary to decide whether the JUA is owed that amount, or some lesser

or higher amount.

RSM also made certain recommendations to "allow for proper validation of CVLI

premiums in the future." Docket No. 140-2 at 12. The JUA seeks to have the Secretary

modify the procedures for collecting and handling CVLI premiums, and requests that the

court impose a daily monetary sanction of $5,000 until the Secretary does so. The Secretary

resists the notion that its current procedures are inadequate, and highlights that the JUA

now directly receives the CVLI premiums from official inspection stations and financial

institutions. Docket No. 146 at 9. As expressed in the court's January 2013 order, there has

been a lack of transparency, accuracy, and accountability in the CVLI premiums transferred

from the PRTD to the JUA.

While the Secretary suggests the issues above have been corrected, they

unfortunately remain. After all, RSM found that the PRTD should have transferred

$337,245.25 to the JUA, and the Secretary acknowledged that this payment should have

been made only in the context of the proceeding presently before the court. And, regardless

of who detected the error, it is undisputed that the PRTD at one point failed to transfer over

$30 million to the JUA and made a payment in June 2009 to correct that error. Thus, the

parties shall meet to discuss the recommendations in RSM's report, and shall inform the

court whether the parties are willing to stipulate to any of the recommendations in that

report. The parties may also inform the court if they can agree to additional procedures that
will allow for greater transparency, accuracy, and accountability in the CVLI premiums
that should have been transferred from the PRTD to the JUA. While it would be within this
court's discretion to impose monetary sanctions, no such sanctions will be imposed at this
time. The parties are strongly urged to cooperate in good faith so that this long-running
dispute can finally come to a close.

## CONCLUSION

For the foregoing reasons, the JUA's motion is **GRANTED IN PART**. And for the
reasons explained above, the court issues the following orders:

A. The Secretary shall inform the court and the JUA: (1) when the litigation
against Susan Gas Station in the Puerto Rico state court has concluded, and
(2) whether the PRTD has collected any payments from the Gas Station.

B. The JUA shall inform the court if it finds evidence that the PRTD received
the disputed CVLI premiums ($1,138,687) from Susan Gas Station.

C. $436,114.32, plus interest, will be attached from the Commonwealth's
General Fund, and these funds will be disbursed to the JUA within 90 days.

D. The parties are ordered to continue working together to ensure that the
PRTD has not underpaid the JUA in the amount of $43,791,736.32. To
effectuate this portion of the order:

a. The Secretary shall appoint an independent auditor to establish that
the underpayment did not occur. The JUA shall also appoint an
independent auditor, which may continue to be RSM, to determine
whether the underpayment in fact occurred.

b. The parties are further ordered to meet for the purposes of
establishing the procedures that will govern each audit.

c. If the parties can agree to the procedures that will govern each audit,
the audits will be conducted in accordance with those procedures. If

the parties cannot agree, they shall inform the court and the court

will procced accordingly.

    d.  When the independent double audit is complete, the parties shall

       inform the court.

E.  The parties shall meet to discuss the "Prospective Recommendations" in

RSM's report. Docket No. 140-2 at 12–13 ¶ V. The parties shall inform the

court whether they are willing to stipulate to any of the recommendations

in RSM's report. The parties may also inform the court if they can agree to

additional procedures that will allow for greater transparency, accuracy, and

accountability in the CVLI premiums that should have been transferred

from the PRTD to the JUA. The parties shall inform the court what

additional procedures, if any, are jointly approved by the parties. If the

parties cannot agree, the court will determine which additional procedures,

if any, are warranted to enforce the injunction.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of December 2016.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge