# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

ASOCIACION DE SUSCRIPCION
CONJUNTA DEL SEGURO DE
RESPONSABILIDAD OBLIGATORIO,

    Plaintiff,

    v.

SECRETARY OF THE TREASURY OF
THE COMMONWEALTH OF PUERTO
RICO,

    Defendant.

Civil No. 08-1707 (BJM)

## OPINION AND ORDER

This case involves a long-running dispute between the Compulsory Liability Joint Underwriting Association (the "JUA")[1] and the Secretary of the Treasury (the "Secretary" or the "PRTD") over the collection of compulsory vehicle liability insurance ("CVLI") premiums. The JUA sought declaratory and injunctive relief in 2008, alleging that the Secretary, in his official capacity, was misappropriating CVLI premiums in violation of the Fifth Amendment's Takings Clause. Docket Nos. 1, 38. The JUA obtained injunctive relief in August 2008, judgment was entered in May 2009, and the Secretary was subsequently adjudged in civil contempt. Docket Nos. 38, 102, 134. In December 2016, the court issued an ancillary court order meant to enforce the Secretary's compliance with the August 2008 injunction. Docket No. 168. The Secretary and the JUA each moved for reconsideration of the portions of the ancillary court order unfavorable to their respective positions. Docket Nos. 169, 171. This case is before me on consent of the parties. Docket No. 164.

For the reasons set forth below, the Secretary's motion for partial reconsideration is **GRANTED**, and the JUA's motion for partial reconsideration is **DENIED**.

---

[1] The Asociacion de Suscripcion Conjunta del Seguro de Responsabilidad Obligatorio ("ASC"), a Commonwealth-created entity, is also known as the Compulsory Liability Joint Underwriting Association of Puerto Rico (the "JUA"). *See* P.R. Laws Ann. tit. 26, §§ 8051–61.

## DISCUSSION[2]

The JUA seeks reconsideration of the portion of the ancillary court order denying attachment of $43,791,736.32 (the "$43 million") of the Commonwealth's funds, and the part requiring a double audit. Docket Nos. 168 at 20, 171, 176, 185. The Secretary seeks reconsideration of the portion of the ancillary court order requiring attachment and disbursement of $436,114.32, plus interest. Docket Nos. 168 at 22 ¶ C, 169, 181-1, 188.

The JUA contends that, even though it is "highly unlikely that the parties will ever be able to carry out a proper audit of" the CVLI premiums that should have been transferred from the PRTD to the JUA, the court should attach $43 million of the Commonwealth's funds anyway and require the Secretary to "bear the risk of loss if it is unable to prove that it fully complied with" the court's orders. Docket No. 171 ¶¶ 12, 13. The JUA underscores that the Secretary has been adjudged in civil contempt, and asserts that the Secretary's "lack of diligence" is enough to attach the Commonwealth's funds. *Id.*

Where "a defendant has failed to comply with a prior injunction," ancillary injunctive relief "is common." *Aristud-Gonzalez* v. *Gov't Dev. Bank for P.R.*, 501 F.3d 24, 27 (1st Cir. 2007) (citing *Nat'l Law Ctr. on Homelessness & Poverty* v. *U.S. Veterans Admin.*, 765 F. Supp. 1, 6 (D.D.C. 1991) ("A court has the authority to issue further orders to enforce its prior injunction")). And when deciding whether to issue an ancillary order, a "court may take into account the compliance with the court's previous orders and the need for a further order to prevent 'inadequate compliance' in the future." *Nat'l Law Ctr. on Homelessness & Poverty*, 765 F. Supp. at 6. But—importantly—"[a]s with the initial injunction, . . . an order granting further injunctive relief must also be 'narrowly tailored *to remedy the specific harm shown*.'" *Nat'l Law Ctr. on Homelessness & Poverty*, 765 F. Supp. at 6 (emphasis added) (quoting *Aviation Consumer Action Project* v. *Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)).

---

[2] This case's background was set forth in the December 2016 ancillary court order, and familiarity with that background is assumed. Docket No. 168 at 2–6.

In this case, because the JUA has not "shown" at this particular juncture that the PRTD has failed to transfer the $43 million, there is insufficient evidence of a constitutional deprivation relating to these particular funds that may be remedied—at this stage of the proceedings—by an ancillary court order. *See, e.g.*, *Nat'l Law Ctr. on Homelessness & Poverty*, 765 F. Supp. at 6. Indeed, the evidence proffered by the JUA—the report prepared by RSM Roc & Company ("RSM")—shows that there is only a "potential" underpayment of these CVLI premiums. Docket No. 140-2 at 11. And the JUA has acknowledged that it is seeking attachment of the $43 million on the basis of "the *possible* underpayment detected by RSM." Docket No. 140 at 9. This evidence is insufficient to grant even a request for preliminary injunctive relief. *See Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Ross-Simons of Warwick, Inc.* v. *Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("the plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm").

Moreover, while it is true that a civil contemnor bears the burden of showing compliance with the court's orders, this court has never issued an ancillary court order finding that the PRTD in fact failed to transfer the $43 million to the JUA. *See Fortin* v. *Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 796 (1st Cir. 1982). Accordingly, to the extent the JUA contends that the court may attach these particular funds as a sanction for the Secretary's civil contempt, that argument is misplaced because it rests on the unfounded premise that the Secretary has violated an ancillary court order with respect to the $43 million at issue. *See Project B.A.S.I.C.* v. *Kemp*, 947 F.2d 11, 16 (1st Cir. 1991) ("civil contempt will lie only if the putative contemnor has violated an order that is clear

and unambiguous," and "any ambiguities or uncertainties in such a court order must be read in a light favorable to the person charged with contempt").

Notwithstanding the JUA's present inability to proffer sufficient evidence supporting the issuance of an ancillary court order attaching the $43 million, this court did not foreclose relief to the JUA. Rather, the JUA asked the court to require the Secretary to show "*in the term[s] to be determined by the court*" that the possible underpayment of the $43 million "did not, in fact, occur." Docket No. 140 at 9 (emphasis added). The court did so in the December 2016 order after taking "into account the" Secretary's prior non-compliance with some of the court's orders, the court's prior finding that the Secretary unconstitutional took some of the JUA's property, and the current state of the evidentiary record. *See Nat'l Law Ctr. on Homelessness & Poverty*, 765 F. Supp. at 6.

The December 2016 order calls for a double audit whereby each party is required to appoint an independent auditor to assess whether the alleged $43 million underpayment in fact occurred. Docket No. 168 at 20, 22 ¶ D. This ancillary remedy—which the JUA resists and the Secretary extols—was issued against a backdrop of issues with transparency, accuracy, and accountability in the PRTD's records. *See* Docket Nos. 134 at 7, 168 at 21. The intent behind the double audit is two-fold. As an initial matter, the double audit may increase the reliability of a finding by this court as to the funds in dispute by potentially ameliorating issues with transparency, accuracy, and accountability in the PRTD's records. *See generally Bruce D. Fisher & Francois Lenglart*, *A Comparative Study of French and U.S. Public Company Governance*, 13 New Eng. J. Int'l & Comp. L. 241, 283 (2007) (the "redundancy" engendered by double audits "helps reduce any propensity for misstatements in . . . financial reports," and a double audit permits one to "compare the two reports for inconsistencies").

Contending that any further audits will be an exercise in futility, the JUA has proffered a letter by RSM's representative stating that it is "impossible" to examine accurately the PRTD's records. Docket No. 185-1. The JUA has also moved for a hearing

to present the testimony of an RSM representative who will testify as much. Docket No. 185 ¶ 5. But, as the Secretary correctly suggests, another auditor may not necessarily agree with RSM, or another auditor may make findings with respect to the precise amounts of CVLI premiums owed that are not entirely congruous with RSM's findings. *See* Docket No. 188 ¶¶ 3–6; *see also Diverges* v. *His Creditors*, 17 La. Ann. 112, 112 (1865) ("Two auditors were appointed in the court below, whose reports are in the record, and in which they agree, except as to one item against, and two in favor, of the insolvent."). Thus, the requested hearing, which will likely add little to move the proceedings forward, is denied. Indeed, even if the proffered testimony is assumed true, the JUA would face a steep uphill climb attempting to convince the court that the $43 million should be attached merely because the Secretary's accounting records are in a state of disarray.

The other reason for the double audit is that it will give the Secretary an opportunity to appoint an auditor that will independently examine the PRTD's records. The JUA expressly asked this court to fashion a remedy that would allow the Secretary to do so, and the JUA effectively backpedals on that request in its request for reconsideration. *Compare* Docket No. 140 at 9 ¶ b (court should order Secretary to show, in the manner decided by the court, that the alleged underpayment did not in fact occur), *with* Docket No. 171 ("no one will ever be sure if all" CVLI premiums were "actually accounted for," and so the double audit is useless), *and* Docket No. 185 (double audit, like the "agreed-upon procedures" conducted by RSM, "would be an exercise in futility").

Moreover, because the Secretary has challenged the findings of the auditor appointed by the JUA, and because the Secretary is entitled—as a matter of due process—to bring the findings of an independent auditor before the court may issue any civil contempt sanctions, the double audit will put this court in a position to make appropriate findings after allowing each party an opportunity to be heard with the help of an expert witness conversant in auditing financial records. *See, e.g.*, *Mercer* v. *Mitchell*, 908 F.2d 763, 766–67 (11th Cir. 1990) ("When the purportedly contumacious conduct occurs outside

the presence of the court, due process requires, with very few exceptions, that the defendant (1) be informed, through a show-cause order, of his purportedly contumacious conduct, and (2) be given a hearing at which he can be represented by counsel, call witnesses, and testify in order to show cause why he should not be held in contempt.").

The JUA also complains that it expended a large amount of resources to pay for the audit conducted by RSM, and suggests that the double audit ordered by the court would require the JUA to expend additional resources. Docket No. 171 ¶ 11. But the December 2016 order expressly states that the JUA "may continue to" use RSM for the court-ordered double audit. Docket No. 168 at 22 ¶ D(a). To the extent this portion of the order was unclear, the JUA may continue to rely on the report prepared by RSM in seeking to prove the factual assertions the JUA has raised with respect to the amounts the PRTD has allegedly failed to transfer to the JUA. *See McComb* v. *Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (district court may provide a "clarification or construction of the order"). Or, if the JUA wishes, the JUA may appoint an independent auditor other than RSM, or the JUA may employ RSM to conduct an additional audit. *See* Docket No. 168 at 22 ¶ D(a). Therefore, the JUA's motion for partial reconsideration is **DENIED**.

The Secretary has also moved for reconsideration, arguing that the court factually erred in finding that the PRTD failed to transfer $436,114.32 (the "$436,000") to the JUA. Docket No. 169 ¶ C. "A motion for reconsideration should be granted only when the defendant identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd.* v. *Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks omitted)); *see also Bucantis* v. *Midland-Ross Corp.*, 81 F.R.D. 623, 625 (E.D. Pa. 1979) ("Despite the omission by counsel, . . . the Court has a duty to prevent manifest injustice").

The $436,000 corresponds to a "shortage" RSM found when the PRTD made a special payment to the JUA. According to RSM's report, the PRTD "self-detected" an omission in CVLI premiums corresponding to the time period between November 2008 and May 2009. Docket No. 140-2 at 8. To correct the omission, the PRTD made a special payment of $32,293,414.60 to the JUA. *Id.* However, RSM found that the total gross omission was higher than the amount detected by the PRTD. Per the findings in RSM's report, the omission totaled $34,452,135.70 without the 5% fee collected by the PRTD, and $32,729,528.92 after factoring in that fee. RSM arrived at the $436,114.32 figure by finding the difference between $32,729,528.92 (the total omission, minus the 5% fee) and $32,293,414.60 (the special payment the PRTD made to the JUA).

As noted in the December 2016 order, the Secretary resisted the attachment of the $436,000 by arguing that this finding was inaccurate because the special payment did not include the month of May 2009. Docket Nos. 146 at 6, 168 at 19–20. As was also noted, the Secretary's motions at that stage of the proceedings stated that this circumstance was disclosed in the "[d]ocumentation [that] was provided to [the JUA's] appointed independent auditors for their examination," specifically, a document titled "Comprobante de Jornal." *Id.* But, because the "Secretary proffered no evidentiary support for this assertion," and because the JUA proffered RSM's report in support of its position, the court found that the attachment of $436,114.32, plus interest, was warranted. *See* Docket No. 168 at 20; *see also Jupiter* v. *Ashcroft*, 396 F.3d 487, 491 (1st Cir. 2005) ("Counsel's factual assertions in pleadings or legal memoranda are not evidence and do not establish material facts").

The Secretary's motion for reconsideration attaches an evidentiary proffer not included in the record while the court was evaluating the JUA's motion to enforce remedies. Docket No. 179-2. Specifically, the Secretary proffers the "Comprobante de Jornal" that was not previously adduced, and the Secretary underscores that this document shows that the month of May 2009 was not included in the special payment the PRTD made

to the JUA. Docket No. 169-1, 179-2. While it would be within the court's discretion not to consider a document that was available but not proffered during prior proceedings, the court will exercise its discretion to "prevent manifest injustice.'" *See Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104; *see also Rivera-Garcia* v. *Sistema Universitario Ana G. Mendez*, 442 F.3d 3, 6 n.3 (1st Cir. 2006) ("there was no abuse of discretion in the district court's rejection of the letter and of plaintiffs' motion to alter judgment on account of a belated evidentiary proffer, especially where that evidence was previously available and should have been submitted to the court for timely consideration").

Faced with the Comprobante de Jornal, the JUA does not dispute the authenticity of this document or the document's contents. Rather, the JUA contends that the court should order the Secretary to produce "the complete set of documents presented to" RSM's representatives, as the Secretary did not allow RSM's representatives to make copies of those documents. Docket No. 176 at ¶ 8. With the "supporting documentation," the JUA contends, RSM's representatives will be able to establish that the $436,000 underpayment in fact occurred. In light of this evidentiary quagmire, and because the parties are already ordered to conduct a double audit, the court, in the interest of judicial economy and avoiding piecemeal litigation, will resolve the disputed $436,000 when it resolves the other amounts at issue. *See D.P. Apparel Corp.* v. *Roadway Exp., Inc.*, 736 F.2d 1, 5 (1st Cir. 1984) (district court has the "power to manage its own affairs and to serve the interests of judicial economy," and may exercise those powers at its discretion). Accordingly, the December 2016 order is modified as follows: the double audit shall encompass the transactions and period of time that allegedly gave rise to the $436,000 underpayment.

To be sure, the JUA also contends that the Secretary should be equitably estopped from disputing the $436,000 underpayment. Under federal equitable estoppel principles, "one may be 'estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.'" *Clauson* v. *Smith*, 823 F.2d

660, 662 (1st Cir. 1987) (quoting *Bergeron* v. *Mansour*, 152 F.2d 27, 30 (1st Cir. 1945)). Equitable estoppel has four elements: "(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Benitez-Pons* v. *Com. of P.R.*, 136 F.3d 54, 63 (1st Cir. 1998) (quoting *Clauson*, 823 F.2d at 661). The burden of proving equitable estoppel lies with the party asserting entitlement to relief under that doctrine. *See, e.g.*, *Albright* v. *FDIC*, 21 F.3d 419, *4 (1st Cir. 1994).

Here, the JUA points to e-mail communications between RSM and the Secretary's counsel which show that the Secretary's counsel was involved in reviewing preliminary drafts of the report prepared by RSM and agreed that the final report issued by RSM included the Secretary's "observations." Docket No. 183-1 at 1–7. On the other hand, the Secretary points to portions of those e-mail communications in which the Secretary's counsel objected to the "procedures" RSM used when preparing the findings in the report, as well as to the "reliability" of that report. Docket Nos. 179-1 at 1–2, 183 at 6–7. Because the Secretary objected generally to the procedures RSM used to generate the report, as well as to the "reliability" of the findings with respect to the CVLI premiums that should have been transferred, there is insufficient evidence to find that the JUA reasonably concluded from the e-mail communications that the Secretary was on board with every finding in RSM's report, including the $436,000 underpayment. *See Clauson*, 823 F.2d at 663 (for equitable estoppel to apply, "[s]ome definite, unequivocal behavior must be shown—conduct fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security"). Thus, the Secretary's motion for partial reconsideration is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Secretary's motion for partial reconsideration is **GRANTED**, and the JUA's motion for partial reconsideration is **DENIED**. The December 2016 ancillary court order is modified—and the court now orders—as follows:

A. The Secretary shall inform the court and the JUA: (1) when the litigation against Susan Gas Station in the Puerto Rico state court has concluded, and (2) whether the PRTD has collected any payments from the Gas Station.

B. The JUA shall inform the court if it finds evidence that the PRTD received the disputed CVLI premiums ($1,138,687) from Susan Gas Station.

C. The parties are ordered to continue working together to ensure that the PRTD has not underpaid the JUA in the amount of $43,791,736.32, as well as in the amount of $436,114.32. To effectuate this portion of the order:

   1. The Secretary shall appoint an independent auditor to determine whether the underpayment in fact occurred. The JUA shall also appoint an independent auditor, which may continue to be RSM, to determine whether the underpayment in fact occurred.

   2. The parties are further ordered to meet for the purposes of establishing the procedures that will govern each audit.

   3. If the parties can agree to the procedures that will govern each audit, the audits will be conducted in accordance with those procedures. If the parties cannot agree, they shall inform the court and the court will proceed accordingly.

   4. When the independent double audit is complete, the parties shall inform the court.

D. The parties shall meet to discuss the "Prospective Recommendations" in RSM's report. Docket No. 140-2 at 12–13 ¶ V. The parties shall inform the court whether they are willing to stipulate to any of the recommendations in RSM's report. The parties may also inform the court if they can agree to additional procedures that will allow for greater transparency, accuracy, and accountability in the CVLI premiums that should have been transferred from the PRTD to the JUA. The parties shall inform the court what

additional procedures, if any, are jointly approved by the parties. If the parties cannot agree, the court will determine which additional procedures, if any, are warranted to enforce the injunction.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of April 2017.

            *S/ Bruce J. McGiverin*
            BRUCE J. McGIVERIN
            United States Magistrate Judge